# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **AMERICAN APPAREL & FOOTWEAR ASSOCIATION, INC.; HALLOWEEN INDUSTRY ASSOCIATION, INC.; JUVENILE PRODUCTS MANUFACTURERS ASSOCIATION, INC.;** and **THE TOY ASSOCIATION, INC.**,<br><br>          Plaintiffs,<br><br>     v.<br><br>**PATRICK ALLEN**, in his official capacity as Director of the Oregon Health Authority; and **ELLEN ROSENBLUM**, in her official capacity as Attorney General for the State of Oregon,<br><br>          Defendants. | Case No. 3:21-cv-1757-SI<br><br>**OPINION AND ORDER** |

James T. McDermott and Dwain M. Clifford, MCDERMOTT WEAVER CONNELLY CLIFFORD LLP, 1000 SW Broadway, Suite 960, Portland, OR, 97205. Of Attorneys for Plaintiffs.

Keith A. Ketterling, Steven C. Berman, and Megan K. Houlihan, STOLL STOLL BERNE LOTKING & SHLACHTER PC, 209 SW Oak Street, Suite 500, Portland, OR 97204. Special Assistant Attorneys General for Defendants.

**Michael H. Simon, District Judge.**

In 2015, the Oregon Legislature enacted the Toxic-Free Kids Act (TFK Act), Oregon

Revised Statutes (ORS) §§ 431A.250-431A.280. Among other things, the TFK Act directs the

Oregon Health Authority (OHA), a state agency, to establish and maintain a list of high priority chemicals of concern for children's health (HPCCCH) when used in children's products (the HPCCCH List) and to issue regulations implementing this law. The TFK Act also requires manufacturers of children's products (or their trade association) to provide biennial notices when a children's product that is sold or offered for sale in Oregon contains a chemical included on the HPCCCH List at or above a de minimis level. On or before the date on which a manufacturer of a children's product submits the third biennial notice required for a listed chemical present in a specified type of children's product, the TFK Act also requires that the manufacturer either: (a) remove or make a substitution for the listed chemical; or (b) request a waiver. In addition, an otherwise covered children's product containing a listed chemical is *exempt* from the law's "removal or substitution" requirement if all levels of listed chemicals in that product are at or below "allowable levels" for children's products established under federal law and the manufacturer has submitted to the OHA appropriate documentation and fees for that exemption.

In this lawsuit, Plaintiffs are four trade associations that represent manufacturers of children's products. Plaintiffs also are members of the "Safe to Play Coalition," a coalition of trade associations representing makers of apparel, toys, crafts, juvenile products, and Halloween items. Plaintiffs seek declaratory and injunctive relief against two officers of the State of Oregon being sued in their official capacities. Plaintiffs ask the Court to enjoin both the Director of the OHA and the Oregon Attorney General from enforcing a portion of the TFK Act and two of its implementing regulations. Plaintiffs contend that the challenged portion of the TFK Act and the two challenged regulations are expressly preempted by federal law, specifically the Federal Hazardous Substances Act (FHSA), 15 U.S.C. §§ 1261-1278a, and the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051-2089. Plaintiffs argue that the FHSA or the CPSA, either

separately or in combination, expressly preempt the challenged state law. Plaintiffs do *not* assert the doctrine of implied preemption, in any of its forms. Plaintiffs bring only an express preemption challenge to the contested state provisions. Plaintiffs do *not* argue that either the challenged portion of the TFK Act or the challenged regulations are preempted "as applied."

The parties have filed two related motions. First, Defendants move to dismiss Plaintiffs' counts to the extent they are based on the FHSA. ECF 33. Second, Plaintiffs move for summary judgment, asking the Court to declare that the challenged portion of the TFK Act and the two challenged regulations are expressly preempted by federal law and to enjoin Defendants from enforcing the challenged provisions. ECF 47. For the reasons explained below, the Court grants Defendants' motion to dismiss and denies Plaintiffs' motion for summary judgment.

## STANDARDS

### A. Motion to Dismiss

A motion to dismiss for failure to state a claim may be granted only when there is no cognizable legal theory to support the claim or when the complaint lacks sufficient factual allegations to state a facially plausible claim for relief. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010). In evaluating the sufficiency of a complaint's factual allegations, the court must accept as true all well-pleaded material facts alleged in the complaint and construe them in the light most favorable to the non-moving party. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012); *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). To be entitled to a presumption of truth, allegations in a complaint "may not simply recite the elements of a cause of action but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The court must draw all reasonable inferences from the factual allegations in favor of the plaintiff. *Newcal Indus. v. Ikon*

*Office Sol.*, 513 F.3d 1038, 1043 n.2 (9th Cir. 2008). The court need not, however, credit a plaintiff's legal conclusions that are couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

A complaint must contain sufficient factual allegations to "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." *Starr*, 652 F.3d at 1216. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Mashiri v. Epsten Grinnell & Howell*, 845 F.3d 984, 988 (9th Cir. 2017) (quotation marks omitted).

## B.  Motion for Summary Judgment

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

### A. Federal Hazardous Substances Act

In 1960, Congress passed the Hazardous Substances Labeling Act "[t]o regulate the interstate distribution and sale of packages of hazardous substances intended or suitable for household use." Pub. L. 86-613, 74 Stat. 372 (July 12, 1960) (codified at 15 U.S.C. §§ 1261 *et seq*.). As originally enacted, this law "was essentially a labeling law and applied only to products packaged in containers intended for household use." *Riegel Textile Corp. v. Celanese Corp*., 649 F.2d 894, 898 (2d Cir. 1981). "The Act defined certain categories of 'hazardous substances' and then prohibited their delivery and receipt in interstate commerce if 'misbranded'; *i.e*., if they did not carry an appropriate warning label. Administration of the Act was vested in the Secretary of Health, Education and Welfare." *Id*.

In 1966, Congress enacted the Child Protection Act of 1966. This law removed the word "Labeling" from the title of the Hazardous Substances Labeling Act, resulting in the current title becoming the "Federal Hazardous Substances Act." *Id*. In addition, the law amended the FHSA "to ban hazardous toys and articles intended for children, and other articles so hazardous as to be dangerous in the household regardless of labeling, and to apply to unpackaged articles intended for household use, and for other purposes." Pub. Law 89-756, 80 Stat. 1303 (November 3, 1966). The 1966 amendments extended the coverage of the FHSA to include any hazardous substance intended for household use or use by children and permitted the responsible agency to ban from interstate commerce products that were so dangerous that no warnings could make the product safe for use. *Riegel Textile*, 649 F.2d at 898.

Three years later, Congress further amended the FHSA in the Child Protection and Toy Safety Act of 1969. These amendments "were designed to provide protection to children from toys and other articles which are hazardous due to the presence of electrical, mechanical or thermal hazards. The 1969 amendments added a section requiring the repurchase of 'banned hazardous substances' by manufacturers, distributors and dealers, including retailers." *Id.*

In its current form, the FHSA prohibits "[t]he introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance." 15 U.S.C. § 1263(a). The FHSA defines "hazardous substance" to include, among other things:

> Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children.

15 U.S.C. § 1261(f)(1)(A). The FHSA also includes within the definition of "hazardous substance" any of the substances that the Consumer Product Safety Commission "by regulation finds, pursuant to the provisions of section 1262(a) of this title, meet the requirements of subparagraph (1)(A) of this paragraph." 15 U.S.C. § 1261(f)(1)(B). The FHSA defines a "banned hazardous substance" to include "(A) any toy, or other article intended for use by children that is a hazardous substance or contains a hazardous substance in such manner as to be susceptible of access by a child or (B) any hazardous substance intended for use in the household that the Consumer Product Safety Commission by regulation classifies as a 'banned hazardous substance.'" 15 U.S.C. § 1261(q)(1).

**B. Consumer Product Safety Act**

In 1972, Congress enacted the CPSA. Pub. L. 92-573, 86 Stat. 1207 (October 27, 1972)

(codified at 15 U.S.C. §§ 2051-2084). Congress identified the purposes of the CPSA as follows:

> (1)    to protect the public against unreasonable risks of injury
> associated with consumer products;
>
> (2)    to assist consumers in evaluating the comparative safety of
> consumer products;
>
> (3)    to develop uniform safety standards for consumer products
> and to minimize conflicting State and local regulations; and
>
> (4)    to promote research and investigation into the causes and
> prevention of product-related deaths, illnesses, and injuries.

15 U.S.C. § 2051(b).

The CPSA established a new and independent federal agency, the Consumer Product

Safety Commission (CPSC or Commission). 15 U.S.C. § 2053. Among other things, the CPSA

provided that whenever the CPSC found that "(1) a consumer product is being, or will be,

distributed in commerce and such consumer product presents an unreasonable risk of injury; and

(2) no feasible consumer product safety standard under this chapter would adequately protect the

public from the unreasonable risk of injury associated with such product," the CPSC "may, in

accordance with section 2058 of this title, promulgate a rule declaring such product a banned

hazardous product." 15 U.S.C. § 2057. The CPSA also stated the procedures needed to be

followed for the CPSC to issue consumer product safety rules. 15 U.S.C. § 2058.

In addition to having the authority to enforce the CPSA, the CPSC has the authority to

enforce the FHSA. 15 U.S.C. § 1261(c) (defining "Commission" under the FHSA to mean the

CPSC); 15 U.S.C. § 2079(a) (transferring the functions of the Secretary of Health, Education,

and Welfare under the FHSA, among other statutes, to the CPSC).

C.  **Consumer Product Safety Improvement Act of 2008**

In 2008, Congress amended both the FHSA and the CPSA through the Consumer Product Safety Improvement Act of 2008 (CPSIA). Pub. L. 110-314, 122 Stat. 3016 (Aug. 14, 2008). The CPSIA specifically addressed "consumer product safety standards and other safety requirements for children's products." *Id*., 122 Stat. at 3016. Among other things, the CPSIA added to the CPSA requirements regarding phthalates[1] in children's toys and child care articles. *Id*. § 108, 122 Stat. at 3036-38.[2] The CPSIA also established requirements for lead and clarified that any toy that exceeded permissible lead limits would "be treated as a banned hazardous substance under the [FHSA]." *Id*. § 101, 122 Stat. at 3017. Additionally, the CPSIA added a definition of "children's product" to the CPSA, *id*. § 235(a)(16), 122 Stat. at 3074, and implemented third-party testing requirements for children's products, *id*. § 102, 122 Stat. at 3022-28. The CPSIA provided for additional enforcement of the CPSA by state attorneys general. *Id*. § 218, 122 Stat. at 3060-62.

The CPSIA also provided that "the provisions of ASTM International Standard F963-07 Consumer Safety Specifications for Toy Safety (ASTM F963) . . . shall be considered to be consumer product safety standards issued by the Commission under [15 U.S.C. § 2058]." *Id.*

---

[1] As explained by the Centers for Disease Control and Prevention, "[p]hthalates are a group of chemicals used to make plastics more durable. They are often called plasticizers." CDC National Biomonitoring Program, *Phthalates Factsheet*, https://www.cdc.gov/biomonitoring/Phthalates_FactSheet.html  (April 5, 2021).

[2] The CPSIA prohibited the sale of any children's toy or child care article "that contains concentrations of more than 0.1 percent of di-(2-ethylhexyl) phthalate (DEHP), dibutyl phthalate (DBP), or benzyl butyl phthalate (BBP)." 15 U.S.C. § 2057c(a). The CPSIA also prohibited, at least until a final rule is promulgated by the CPSC, the sale of "any children's toy that can be placed in a child's mouth or child care article that contains concentrations of more than 0.1 percent of diisononyl phthalate (DINP), diisodecyl phthalate (DIDP), or di-n-octyl phthalate (DnOP)." 15 U.S.C. § 2057c(b)(1).

§ 106(a), 122 Stat. at 3033 (codified at 15 U.S.C. § 2056(b) "Mandatory Toy Safety Standards"). ASTM is a global private standard-setting body.[3] ASTM F963-17 is titled "Standard Consumer Safety Specification for Toy Safety." ECF 48-2. Section 4.3.5 of ASTM F963-17 (titled "Heavy Elements") addresses lead paint and other surface-coating materials containing antimony, arsenic, barium, cadmium, chromium, lead, mercury, and selenium. ECF 48-2 at 10-12. As explained by Plaintiffs, ASTM F963 "includes detailed requirements 'intended to reduce children's exposure to heavy elements that may be contained in accessible toy substrate materials' in children's toys." ECF 47 at 48; *see also* ECF 48-2 at § 4.3.5.

Although the CPSIA amended both the FHSA and the CPSA, it did not combine the previously enacted statutes or in any way destroy the distinction between them. The FHSA, and not the CPSA, still covers "banned hazardous substances." *Nat. Res. Def. Council, Inc. v. U.S. Consumer Prod. Safety Comm'n*, 597 F. Supp. 2d 370, 388 n.11 (S.D.N.Y. 2009). Additionally, unlike the FHSA, "the CPSA has a provision for private enforcement through citizen suits." *Id*. (citing 15 U.S.C. § 2073); *see Riegel Textile*, 649 F.2d 894 (holding that a manufacturer of children's pajamas did not have a private right of action under the FHSA against a manufacturer of synthetic fibers).

**D.  Oregon's Toxic-Free Kids Act**

Three sections of the TFK Act are particularly relevant to this lawsuit. The first is ORS § 431A.255 (the **List Statute**). The second is ORS § 431A.258 (the **Notice Statute**). The third is ORS § 431A.260 (the **Removal Statute**). Each is separately described below. In addition, the OHA has issued Oregon Administrative Regulations (OAR) implementing the TFK Act. Two implementing regulations are particularly relevant here. They are OAR 333-016-2060

---

[3] *See* https://www.astm.org/about/overview.html.

(the **Notice Regulation**) and OAR 333-016-3015 (the **Exemption Regulation**). Under the **List Statute** (ORS § 431A.255), the OHA "shall establish and maintain a list of high priority chemicals of concern for children's health when used in children's products." ORS § 431A.255(1). The OHA has done so, issuing its HPCCCH List and periodically updating it. OAR 333-016-2020. As of January 1, 2022, the HPCCCH List contains 73 chemicals designated as high priority chemicals of concern for children's health when used in children's products. *Id*.

Under the **Notice Statute** (ORS § 431A.258), "[a] manufacturer of a children's product sold or offered for sale in this state that contains a chemical included on the list established and maintained under ORS § 431A.255 in an amount at or above a de minimis level shall provide a biennial notice as described in subsection (2) of this section to the Oregon Health Authority by January 1 of each applicable notice year." ORS § 431A.258(1)(a).[4] Among other things, the required notice must contain "[t]he amount of the chemical used in each unit of the children's product reported as a range rather than an exact amount." ORS § 431A.258(2)(d). The **Notice Statute** also provides that the OHA "shall grant an exemption to a manufacturer of children's products that applies for an exemption from the notice requirements of this section if the application demonstrates" that the listed HPCCCH chemical "is present in the children's product otherwise subject to the notice requirements of this section only as a contaminant" and certain contaminant control standards are met. ORS § 431.258(5). The **Notice Statute** further provides

---

[4] Under the TFK Act, "'[d]e minimis level' means: (a) For a chemical that is an intentionally added chemical, the practical quantification limit; or (b) For a chemical that is a contaminant, a concentration of 100 parts per million." ORS § 431A.253(5). "'Practical quantification limit' means the lowest concentration of a chemical that can be reliably measured within specified limits of precision, accuracy, representativeness, completeness and comparability during routine laboratory operating conditions." ORS § 431A.253(9).

that "[a] trade association may provide required notices on behalf of its member manufacturers under the provisions of this section." ORS § 431.258(6).

Under the **Notice Regulation** (OAR 333-016-2060), the notice required under the TFK Act must include, among other things, "[t]he amount of the chemical used in each unit within each product category," reported as a range. OAR 333-016-2060(5)(d). Further, "'unit' has the same meaning as 'component part' as that [term] is defined in OAR 333-016-2010." OAR 333-016-2060(1). As referenced in the **Notice Regulation**, "component part," under OAR 333-016-2010(9), means "a uniquely identifiable material or coating (including ink or dye) that is intended to be included as a part of a finished children's product." Also under the **Notice Regulation**, a manufacturer's first notice became due on January 1, 2018, and was applicable to children's products sold in Oregon during the 2017 calendar year. OAR 333-016-2060(3). Subsequent reports became due on January 1st of even numbered years for the previous two-year biennial notice period. OAR 333-016-2060(4). Thus, subsequent reports were due on January 1, 2020, and January 1, 2022, and the next report is due on January 1, 2024.

Under the **Removal Statute** (ORS § 431A.260):

> On or before the date on which a manufacturer of a children's product submits the third biennial notice required under [the **Notice Statute**] for a chemical that is present in a children's product, the manufacturer must remove or make a substitution for the chemical . . . or seek a waiver . . . , if the chemical is present in a children's product that is: (a) Mouthable; (b) A children's cosmetic; or (c) Made for, marketed for use by or marketed to children under three years of age.

ORS § 431A.260(1).[5]

---

[5] Under the TFK Act, "mouthable" means, "in describing a children's product or any part of a children's product, that an intended use of the product or any part of the product includes being placed in the mouth for any purpose." ORS § 431A.253(8).

The **Removal Statute** also provides the following exemption:

> Manufacturers are exempt from meeting the requirements of this section for children's products described in subsection (1) of this section that contain high priority chemicals of concern for children's health used in children's products at levels that are at or below allowable levels for children's products as established by the Consumer Product Safety Improvement Act of 2008, P.L. 110-314, 122 Stat. 3016, as in effect on July 27, 2015.

ORS § 431A.260(3). The **Removal Statute** further provides that the OHA "shall adopt rules providing for additional exemptions from the requirements of this section. ORS 431A.260(4)(a).

It also states:

> For purposes of this subsection, any consumer product safety standard adopted under federal law that establishes allowable levels for children's products of a high priority chemical of concern for children's health used in children's products is presumed to establish the maximum allowable level of the chemical that may be used in children's products that are sold or offered for sale in this state. The authority may not require a manufacturer in compliance with the federal standard to also comply with the provisions of this section unless the authority establishes in the rulemaking process that a lower maximum allowable level for children's products of a high priority chemical of concern for children's health used in children's products than the allowable level set by the federal standard is necessary to protect human health and welfare.

ORS § 431A.260(4)(b).

Under the **Exemption Regulation** (OAR 333-016-3015), a manufacturer is exempt from meeting the requirement of removal or substitution of a chemical on the HPCCCH List in a children's product under the **Removal Statute** (ORS § 431A.260) under any of the following four circumstances:

> (a)    The children's product contains a HPCCCH used in children's products at levels that are at or below allowable levels for children's products as established by the Consumer Product Safety Improvement Act of 2008, P.L. 110-314, 122 Stat. 3016, as in effect on July 27, 2015.

(b)      *A manufacturer is in compliance with a federal consumer product safety standard adopted under federal law that establishes allowable levels for children's products of a high priority chemical of concern for children's health used in children's products.*

(c)      The State of Washington has granted an exemption for the removal or substitution of a HPCCCH in the same children's product model for which the exemption is requested under OAR 333-016-3015 ([**Exemption Regulation**]).

(d)      A children's product has been tested under applicable EN-71 standards, by a laboratory that is accredited to conduct such testing under the current edition of ISO/IEC 17025 by an accreditation body that is a signatory to the International Laboratory Accreditation Cooperation mutual recognition arrangement.

OAR 333-016-3015(2) (emphasis added).

Further, to qualify for an exemption under the **Exemption Regulation**, "a manufacturer must submit an exemption request and the fees specified in OAR 333-016-2080(1)(e)" and provide to the OHA "written supporting documentation, an electronic copy of the certificate of conformity, if available, that is issued by the applicable authority or an authorized designate, and any other supporting documentation that provides evidence that the children's product meets the applicable standards described in the applicable category." OAR 333-016-3015(4). The required exemption fee is $1,500. OAR 333-016-2080(1)(e). For an exemption request under subsection 2(b) of the **Exemption Regulation**, the written supporting documentation must include "a citation to the federal consumer product safety standard adopted under federal law *that establishes an allowable level of a HPCCCH in children's products*, specific to allowable levels of the HPCCCH in children's products[.]" OAR 333-016-3015(4)(b) (emphasis added). Finally, "[m]ore than one product model may be submitted in a single exemption request." OAR 333-016-3015(3).

**DISCUSSION**

**A.  Federal Preemption Generally**

The Supremacy Clause of the United States Constitution provides, in relevant part, that "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. The preemption doctrine is derived from the Supremacy Clause and "any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)). "This means that when federal and state law conflict, federal law prevails and state law is preempted." *Knox v. Brnovich*, 907 F.3d 1167, 1173 (9th Cir. 2018) (quoting *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1476 (2018)).

The Supreme Court has explained that preemption "may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade*, 505 U.S. at 98 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). The Supreme Court in *Gade* added: "Our ultimate task in any preemption case is to determine whether state regulation is consistent with the structure and purpose of the [federal] statute as a whole." *Gade*, 505 U.S. at 98. Also, "the purpose of Congress is the ultimate touchstone in every preemption case." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).

Implied preemption may be either field preemption or conflict preemption, and conflict preemption may be based on either impossibility or obstacle. *Gade*, 505 U.S. at 98. "Field preemption occurs when federal law occupies a 'field' of regulation 'so comprehensively that it has left no room for supplementary state legislation." *Knox*, 907 F.3d at 1174. Conflict preemption is narrower, as explained by the Ninth Circuit:

> Conflict preemption is narrower than field preemption. Under conflict preemption principles, state law is preempted to the extent that it actually conflicts with federal law. Courts have found conflict preemption in two situations: (1) where compliance with both state and federal law is impossible, or (2) where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.( A state law may stand as an obstacle to the regulatory system Congress chose if Congress chooses a specific method of enforcement to achieve federal goals, and a state law adopts a different enforcement method that interferes with the careful balance struck by Congress. If Congress has not adopted a comprehensive regulatory program in a specific area, however, the state has authority to pass its own laws on the subject."

*Id.* at 1175 (citations and quotation marks omitted).

In this lawsuit, Plaintiffs allege only *express* preemption.[6] The Ninth Circuit recently discussed express preemption in *R.J. Reynolds Tobacco Co. v. County of Los Angeles*, explaining: "We begin with the wording of [the federal statute's preemption provision], but we must also consider the statute as a whole to determine whether the local ordinance actually conflicts with the overall federal regulatory scheme." 29 F.4th 542, 553 (9th Cir. 2022) (cleaned up) (quoting *U.S. Smokeless Tobacco Mfg. Co. LLC v. City of New York*, 708 F.3d 428, 432 (2d Cir. 2013) ("Where, as here, Congress has specifically addressed the preemption issue, our task is primarily one of interpreting what Congress has said on the subject.")). In *R.J. Reynolds*, the Ninth Circuit further explained:

> In interpreting statutes wholistically, we must strive to "giv[e] effect to each word and mak[e] every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous." *Shelby v. Bartlett*, 391 F.3d 1061, 1064 (9th Cir. 2004) (citation omitted). We also "assum[e] that the ordinary meaning of that language

---

[6] *See, e.g.*, Complaint (ECF 1) at ¶¶ 1, 37, 39, 54, 57, 62, 92, and 96; *see also* Plaintiffs' Response to Defendants' Motion to Dismiss (ECF 34) at 15 ("In cases where there is an express-preemption provision at play, the Ninth Circuit has held that the specific terms of the preemption provision control the outcome of the case.").

accurately expresses the legislative purpose." *Engine Mfrs. Ass'n*
*v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)
(citation omitted).

*R.J. Reynolds Tobacco*, 29 F.4th at 553.

## B.  Distinguishing Between Facial and As-Applied Preemption Challenges

In this lawsuit Plaintiffs make only a *facial* preemption argument; they do not assert an

"as-applied" challenge.[7] The argument that a state's law is preempted by federal law may be

made either "facially" or in a challenge "as-applied." There is a difference. *See Puente Arizona v.*

*Arpaio*, 821 F.3d 1098, 1101 (9th Cir. 2016); *see also id*. at 1107 ("While these arguments may

be persuasive in the context of Puente's as-applied challenge, we do not find them persuasive in

a facial attack.").

The distinction between a facial challenge and one that is "as-applied" is important. As

the Supreme Court explained in *United States v. Salerno*: "A facial challenge to a legislative Act

is, of course, the most difficult challenge to mount successfully, since the challenger must

establish that no set of circumstances exists under which the Act would be valid." 481 U.S. 739,

745 (1987). The Supreme Court has applied the *Salerno* rule to a federal preemption *facial*

challenge to a state statute. *See Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (unanimous

opinion) (applying *Salerno* to a federal preemption facial challenge to a state statute).

Similarly, the Ninth Circuit applies the *Salerno* rule in facial preemption cases. *See Sprint*

*Telephony PCS, L.P. v. Cnty. of San Diego*, 543 F.3d 571, 579 n.3 (9th Cir. 2008) (en banc)

---

[7] *See, e.g.*, American Apparel's Responses and Objections to Defendants' First Requests
for Production (ECF 41-1) at 2 ("In this action, Plaintiff brings a facial challenge to three Oregon
requirements . . . as preempted by the express-preemption provisions of the Consumer Product
Safety Act and the Federal Hazardous Safety Act. Because Plaintiff does not bring an 'as
applied' challenge to these Oregon requirements, discovery seeking facts 'as applied' to a
particular Plaintiff are irrelevant and need not be produced.").

("The Supreme Court and this court have called into question the continuing validity of the *Salerno* rule in the context of First Amendment challenges. In cases involving federal preemption of a local statute, however, *the rule applies with full force*." (citations omitted) (emphasis added)); *Engine Mfrs. Ass'n*, 498 F.3d at 1049 (holding that *Salerno* applied to the question of whether the Clean Air Act's express provisions facially preempted each of the several challenged state provisions); *see also Puente Arizona*, 821 F.3d at 1104 (recognizing that "*Salerno*'s applicability in preemption cases is not entirely clear" based on the First Amendment facial challenge cases of the Supreme Court, but concluding that "[w]ithout more direction, we have chosen to continue applying *Salerno*. We therefore proceed, keeping in mind the high bar that Puente must overcome under *Salerno* before we may strike down the identity theft laws on this facial challenge" (citations and footnote omitted)).

**C.  The Limited Scope of Plaintiffs' Challenges in this Lawsuit**

In this lawsuit, Plaintiffs assert what they label as three counts. In their first count, Plaintiffs challenge the **Exemption Regulation** (OAR 333-016-3015), arguing that this regulation, on its face, is expressly preempted by both the FHSA and the CPSA. According to Plaintiffs, the TFK Act "automatically" exempts manufacturers and children's products that comply with federal law, yet the **Exemption Regulation** requires Plaintiffs to submit certain documentation and pay a fee to qualify for exemption from the TFK Act. Plaintiffs argue that, to this extent, the **Exemption Regulation** is expressly and facially preempted.

In their second count, Plaintiffs challenge the **Exemption Regulation** (OAR 333-016-3015) under state law. Plaintiffs argue that the documentation and fee requirements imposed by the **Exemption Regulation** add burdens not required under the

**Removal Statute** (ORS § 431A.260).[8] Thus, argue Plaintiffs, the OHA has exceeded its state statutory authority by adding the additional requirements found in the **Exemption Regulation** that are not contained in or expressly authorized by the TFK Act.

In their third count, Plaintiffs challenge both the **Notice Statute** (ORS § 431A.258) and the **Notice Regulation** (OAR 333-016-2060). Plaintiffs argue, in a facial challenge, that the FHSA and the CPSA expressly preempt both the **Notice Statute** and the **Notice Regulation**. According to Plaintiffs, Congress and the CPSC require that only "accessible" chemicals in children's toys are subject to testing, measurement, and regulation. Plaintiffs add that the TFK Act bans, after three cycles of biennial notice, products that do not comply with the TFK Act and its implementing regulations. Plaintiffs assert that by requiring manufacturers to determine and disclose the amount of a listed HPCCCH chemical present in a component part that is *not* accessible to a young child, the **Notice Statute** and the **Notice Regulation** disrupt the uniformity that the federal scheme was intended to provide. Plaintiffs argue that federal law preempts *any* State requirements of testing or disclosing the amount of chemicals in a toy part that is *not* accessible to children and that the resulting burden on manufacturers for toys sold or offered for sale in Oregon destroys the uniform system of identification, testing, and banning allegedly provided under federal law.

---

[8] The **Removal Statute** provides, in relevant part: "The Oregon Health Authority shall adopt rules providing for additional exemptions from the requirements of this section." ORS § 431A.260(4)(a). In addition, ORS § 413.042 provides that the Director of the OHA "may adopt rules necessary for the administration of the laws that the Oregon Health Authority is charged with administering."

**D.  Whether the FHSA Expressly and Facially Preempts the Challenged Provisions**

    **1.  Express Preemption Under the FHSA**

When Congress first passed what later became known as the FHSA in 1960, that law contained no express preemption provision. *See Moss v. Parks Corp*., 985 F.2d 736, 739 (4th Cir. 1993) (describing the history of FHSA). In 1966, Congress amended the FHSA and added a preemption provision regarding precautionary labeling. *See* Child Protection Act of 1966, Pub. L. 89-756, § 4, 80 Stat. 1303, 1305 (1966) (codified at 15 U.S.C. § 1261 Note (b)(1)(A)).

In 1972, Congress passed the CPSA, which contained its own preemption provision, discussed *infra*. *See* 15 U.S.C. § 2075(a). The CPSA, however, also permitted states to apply for permission to impose more stringent requirements. 15 U.S.C. § 2075(c). Three years later, in 1975, Congress heard testimony from several industries concerned with the difficulties of complying with different state and federal regulations. *See Consumer Product Safety Commission Oversight: Hearings on S. 644 and S. 100 Before the Subcomm. for Consumers of the Senate Committee on Commerce*, 94th Cong. 127 (1975 Senate Hearings).

In 1976, Congress decided not to allow States to impose safety standards higher than federal requirements under the FHSA, as permitted under the CPSA. Instead, Congress adopted an "identicality" standard in a second preemption provision in the FHSA, which immediately followed the labeling preemption provision. *See* Consumer Product Safety Commission Improvement Act of 1976, Pub. L. No. 94-284, § 17, 90 Stat. 503 (1976) (codified at 15 U.S.C. § 1261 Note (b)(1)(B)).

This preemption provision under the FHSA read then, and still reads today, as follows:

> Except as provided in paragraphs (2), (3), and (4), *if under regulations of the Commission promulgated under or for the enforcement of section 2(q)* [15 U.S.C. § 1261(q)] a requirement is established to protect against a risk of illness or injury associated with a hazardous substance, no State or political subdivision of a

> State may establish or continue in effect a requirement applicable
> to such substance and designed to protect against the same risk of
> illness or injury unless such requirement is identical to the
> requirement established under such regulations.

15 U.S.C. § 1261 Note (b)(1)(B) (emphasis added). This is the operative preemption provision

under the FHSA at issue in this lawsuit. The FHSA's preemption provision explicitly references

15 U.S.C. §1261(q), which, among other things, defines the phrase "banned hazardous

substance" and describes the procedures that the Commission must follow to issue, amend, or

repeal regulations relating to such substances.

### 2. Application of FHSA Preemption to the Challenged Provisions

As of January 1, 2022, the HPCCCH List contains 73 chemicals designated as high

priority chemicals of concern for children's health (HPCCCH) when used in children's products.

OAR 333-016-2020. During oral argument, the parties agreed that 69 of these 73 chemicals have

not been expressly mentioned in any relevant regulation issued under the FHSA.[9] Based on this

undisputed fact, Defendants argue that, under the *Salerno* rule, Plaintiffs cannot prevail on their

facial challenge asserting that the FHSA expressly preempts the TFK Act's **Notice Statute**,

**Notice Regulation**, and **Exemption Regulation**.[10]

In response, Plaintiffs argue that because the FHSA bans all 73 of the listed HPCCCH

chemicals if certain conditions apply, that is sufficient for express preemption. Plaintiffs assert:

---

[9] A few additional chemicals have been mentioned in "non-binding" regulations, but Plaintiffs do not rely on those to support their argument of preemption. Thus, they are not "relevant" regulations.

[10] As previously noted, Plaintiffs have not asserted, even in the alternative, an as-applied preemption challenge. If Plaintiffs decide at some later time to assert an as-applied challenge to one or more of the of chemicals on the HPCCCH List that are also expressly mentioned in relevant federal regulations, a more suitable record will need to be developed. *See Puente Arizona*, 821 F.3d at 1105 n.7.

> Perhaps the Defendants' gravest and most consistent error in all of the briefing submitted to this Court has been Defendants' stubborn failure to recognize that the FHSA, through 16 C.F.R. § 1500.3, applies to ban every one of Oregon's 73 HPCCCHs *if those chemicals are present in a children's product in a way presenting a risk of toxic exposure and harm.*

ECF 56 at 7 (Plaintiffs' Reply in Support of Motion for Summary Judgment) (emphasis added).

Defendants refer to 16 C.F.R. § 1500.3, which is a rule issued by the CPSC titled "Definitions." Subsection (b) of this rule contains certain "statutory definitions," including the definitions of "hazardous substance" and "banned hazardous substance." 16 C.F.R. § 1500.3(b)(4) (defining "hazardous substance"); 16 C.F.R. § 1500.3(b)(15) (defining "banned hazardous substance"). As the rule itself expressly states, however, "the definitions set forth in section 2 of the act are applicable to this part *and are repeated for convenience* as follows." 15 C.F.R. § 1500.3(b) (emphasis added). The definitions of "hazardous substance" and "banned hazardous substance" in the regulations, 16 C.F.R. § 1500.3(b), are essentially identical to the definitions of those terms in the FHSA statute itself. *Compare* 15 U.S.C. § 1261(f) (defining "hazardous substance") *with* 16 C.F.R. § 1500.3(b)(4) (defining "hazardous substance"); *compare also* 15 U.S.C. § 1261(q)(1) (defining "banned hazardous substance") *with* 16 C.F.R. § 1500.3(b)(15) (defining "banned hazardous substance"). Thus, the definitions regulation relied on by Plaintiffs do only what the CPSC says it does—repeat the definitions "for convenience." The CPSC has not exercised any independent judgment or expertise in simply repeating statutory definitions "for convenience." Therefore, this regulation does not create any express preemption, contrary to Plaintiffs' contention.

Returning to Plaintiffs' summary of their primary argument, Plaintiffs assert that 16 C.F.R. § 1500.3 bans all Oregon's 73 listed HPCCCH chemicals "*if those chemicals are present in a children's product in a way presenting a risk of toxic exposure and harm.*" This conclusion

also is not anything more than a tautology. Moreover, it fails to inform anyone—not

manufacturers, not retailers, not the OHA, and not parents purchasing toys for their children—

whether a particular chemical is present in a children's product in a way that presents a risk of

toxic exposure or harm. For that, expertise is needed. If the CPSC has not exercised its authority

to regulate a specific substance, then a State is free to do so.

> As explained by the Second Circuit:

>> [T]he [FHSA] does not purport to establish a comprehensive
>> federal scheme of regulating hazardous substances found in the
>> household. In fact, the FHSA does not itself ban any items or
>> require any precautions. Instead, it authorizes regulations to be
>> issued by the Consumer Product Safety Commission ("CPSC" or
>> "Commission") pursuant to the Act, and sets guidelines to be
>> followed by the CPSC in promulgating those regulations.

>> The FHSA also permits a system of partial preemption, under
>> which, in an area in which the Commission has not acted, state
>> regulations may supplement the regulations adopted by the CPSC.

>> *   *   *

>> *That is, preemption obtains only where a state action regulates the
>> same* "*hazardous substance*" *and the same* "risk of illness or injury
>> associated with [that] hazardous substance" *which a FHSA
>> regulation regulates.*

>> "Hazardous substance" is a term of art in the FHSA.
>> Section 2(f)(1)(D) of the statute defines the phrase to include,
>> among other things, "[a]ny toy or other article intended for use by
>> children which the Secretary by regulation determines, in
>> accordance with section 1262(e) of this title, presents an electrical,
>> mechanical, or thermal hazard." 15 U.S.C. § 1261(f)(1)(D) (1982).

>> The CPSC adopted the two small parts regulations at issue here—
>> now codified as 16 C.F.R. § 1500.18(a)(9) and 16 C.F.R. § 1501—
>> on June 15, 1979. The FHSA authorizes the promulgation of both
>> banning regulations and labeling regulations; the regulations at
>> issue are banning regulations.

*Toy Mfrs. of Am., Inc. v. Blumenthal*, 986 F.2d 615, 617-18 (2d Cir. 1992) (emphasis added).

In *Blumenthal*, the district court denied the plaintiff toy manufacturer's association's motion for preliminary injunction, and the Second Circuit affirmed. Regarding the issue of express preemption under the FHSA, the Second Circuit held:

> Here the Commission has not, subtly or otherwise, manifested an intention to shut out state action. Neither the actual words of the CPSC regulations, the statements of the Commissioners explaining their decision not to issue additional regulations, nor any other action by the Commission, indicates an intent to establish a comprehensive scheme of or assert exclusive control over the area of small parts regulation.
>
> In sum, neither the explicit statutory language nor the structure and purpose of the FHSA or of the CPSC regulations indicates that the federal small parts regulations were meant to govern small parts in all toys.

*Id.* at 623.

The Court agrees with the Second Circuit and reaches the same conclusion here. At least regarding the 69 chemicals that the Commission has not expressly regulated, or even discussed, under the FHSA, neither the explicit statutory language in the FHSA, nor the structure and purpose of the FHSA, nor the CPSC regulations indicates that any federal regulations were meant to govern any of these 69 high priority chemicals of concern for children's health when used in children's products. In summary, because the CPSC has not promulgated any rules under 15 U.S.C. § 1261(q) associated with any of these 69 chemicals, the FHSA does not, at least on a facial challenge, expressly preempt any of the Oregon statutory or regulatory provisions at issue in the pending motion. *See* 15 U.S.C. § 1261 Note (b)(1)(B).

**E.  Whether the CPSA Expressly and Facially Preempts the Challenged Provisions**

**1.  Express Preemption Under the CPSA**

The express preemption provision of the CPSA reads:

> *Whenever a consumer product safety standard under this chapter is in effect* and applies to a risk of injury associated with a

> consumer product, no State or political subdivision of a State shall
> have any authority either to establish or to continue in effect any
> provision of a safety standard or regulation which prescribes any
> requirements as to the performance, composition, contents, design,
> finish, construction, packaging, or labeling of such product which
> are designed to deal with the same risk of injury associated with
> such consumer product, unless such requirements are identical to
> the requirements of the Federal standard.

15 U.S.C. § 2075(a) (emphasis added).

The CPSA defines and explains the phrase "consumer product safety standard," which is

referenced in 15 U.S.C. § 2075(a), as follows:

> The Commission may promulgate consumer product safety
> standards in accordance with the provisions of section 2058 of this
> title. A consumer product safety standard shall consist of one or
> more of any of the following types of requirements:
>
> > (1) Requirements expressed in terms of performance
> > requirements.
>
> > (2) Requirements that a consumer product be marked with
> > or accompanied by clear and adequate warnings or instructions, or
> > requirements respecting the form of warnings or instructions.
>
> Any requirement of such a standard shall be reasonably necessary
> to prevent or reduce an unreasonable risk of injury associated with
> such product.

15 U.S.C. § 2056(a).[11]

---

[11] The CPSA also provides that "[u]pon application of a State or political subdivision of a State, the Commission may by rule, after notice and opportunity for oral presentation of views, exempt from the provisions of subsection (a) . . . any proposed safety standard or regulation which is described in such application and which is designed to protect against a risk of injury associated with a consumer product subject to a consumer product safety standard under this chapter." 15 U.S.C. § 2075(c). The CPSC, however, may exempt a State from preemption only if the State provides "a significantly higher degree of protection from such risk of injury than the consumer product safety standard under this chapter" and "does not unduly burden interstate commerce." *Id.*

### 2.  Application of CPSA Preemption to the Challenged Provisions

As noted, the HPCCCH List currently contains 73 chemicals designated as high priority chemicals of concern for children's health when used in children's products. OAR 333-016-2020. During oral argument, the parties agreed that 57 of these 73 chemicals have not been expressly mentioned in any *relevant* regulation issued under the CPSA. Based on this undisputed fact, Defendants argue that, under the *Salerno* rule, Plaintiffs cannot prevail on their "facial" challenge. As with their arguments related to the FHSA, Plaintiffs rely on the definition of "banned hazardous substance" in the federal regulations, which merely restate the statutory definitions "for convenience." For the same reasons, the Court does not find Plaintiffs' argument persuasive.

Further, in *National Kerosene Heater Association, Inc. v. Commonwealth of Massachusetts*, 653 F. Supp. 1079 (D. Mass. 1986), the district court provided a thorough and well-reasoned discussion of express preemption under the CPSA. As explained in that case:

> Section 2075(a) provides that state and local law are preempted "[w]henever a consumer product safety standard under this chapter is in effect". This condition is not met where the Commission informally relies on a voluntary standard under § 2056(b). A consumer product safety standard is not "in effect" unless it has been promulgated "in accordance with the provisions of section 2058" as required by § 2056(a).
>
> \*    \*    \*
>
> The crux of the statutory scheme, however, is § 2058, which establishes a comprehensive procedure governing the adoption of standards. The limitations contained in § 2056(a) and (b) are incorporated into this procedure as findings required before a mandatory standard may be promulgated. § 2058(f)(3)(A), (f)(3)(D). Section 2058(a)(6) and 2058(b)(2) provide a procedural avenue by which a voluntary standard meriting deference under § 2056(b) may be publicly recognized.
>
> Acceptance of plaintiff's contentions would eviscerate this carefully designed process.

*Id.,* at 1086-87. Moreover, the district court in *National Kerosene* rejected a preemption argument when the Commission merely authorized private parties to adopt "voluntary standards," as opposed to promulgating binding regulations. Here, the argument against express preemption is even stronger because, at least for 57 chemicals identified on the Oregon HPCCCH List, the Commission has not acted at all. Under the CPSA's express preemption provision, preemption occurs only when there is "a consumer product safety standard" promulgated by the Commission that is in effect. *See* 15 U.S.C. § 2075(a); 15 U.S.C. § 2056(a).

Further, in the CPSA, Congress expressly stated:

> Whenever the Commission finds that—
>
> (1) a consumer product is being, or will be, distributed in commerce and such consumer product presents an unreasonable risk of injury; and
>
> (2) no feasible consumer product safety standard under this chapter would adequately protect the public from the unreasonable risk of injury associated with such product,
>
> the Commission may, in accordance with section 2058 of this title, promulgate a rule declaring such product a banned hazardous product.

15 U.S.C. § 2057. This confirms that Congress intended the Commission to exercise judgment and expertise when declaring a product, substance, or material to be a "banned hazardous substance." Moreover, the Commission has shown that it knows how to exercise its judgment and promulgate regulations. In 16 C.F.R. § 1303.1, the CPSC expressly stated that it

> declares that paint and similar surface-coating materials for consumer use that contain lead or lead compounds and in which the lead content (calculated as lead metal) is in excess of 0.06 percent (0.06 percent is reduced to 0.009 percent effective August 14, 2009 as mandated by Congress in section 101(f) of the Consumer Product Safety Improvement Act of 2008, Pub. L. 110-314) of the weight of the total nonvolatile content of the paint or the weight of the dried paint film (which paint and similar surface-coating materials are referred to hereafter as "lead-

containing paint") *are banned hazardous products under sections 8 and 9 of the Consumer Product Safety Act (CPSA), 15 U.S.C. 2057, 2058. The following consumer products are also declared to be banned hazardous products*:

> (1)    Toys and other articles intended for use by children that bear "lead-containing paint".
>
> (2)    Furniture articles for consumer use that bear "lead-containing paint".

16 C.F.R. § 1303.1(a) (emphasis added). Plaintiffs' argument reads too much into the statutory definition of "banned hazardous substance" and, if adopted, would adversely affect the careful federalism balance intended under the law governing express preemption.[12]

## F. Plaintiffs' State Law Argument Against the Challenged Regulations

Plaintiffs' second count challenges only the **Exemption Regulation** (OAR 333-016-3015) and only under state law. Plaintiffs argue that the regulation's documentation and fee requirements add burdens not required under the **Removal Statute** (ORS § 431A.260). Thus, according to Plaintiffs, the OHA has exceeded its state statutory authority. Plaintiffs' second count faces two preliminary jurisdictional issues.

As noted, Plaintiffs' first and third counts challenge portions of the TFK Act and two of its implementing regulations as preempted by federal law, rendering them unconstitutional under the Supremacy Clause. Accordingly, this Court has subject matter jurisdiction over those two counts under the federal question doctrine. 28 U.S.C. § 1331. In addition, because Plaintiffs'

---

[12] At various points, Plaintiffs argue that even if the challenged provisions under the TFK Act and its regulations are not *expressly* preempted by either the text of the FHSA or the text of the CPSA standing alone, they still may be "expressly" preempted by the two statutes taken together. This conclusion, however, appears to be more aptly directed to an argument of implied preemption, either field or obstacle. Because Plaintiffs have repeatedly stated that they are asserting only an argument based on express preemption and making only a facial argument, the Court does not consider at this time any argument other than Plaintiffs' express, facial preemption challenge.

second count is sufficiently related to its first and third counts as to form part of the same case or controversy, the Court may exercise supplemental jurisdiction over Plaintiffs' second count. 28 U.S.C. § 1367. This does not mean, however, that the Court must exercise supplemental jurisdiction. A district court "may decline to exercise supplemental jurisdiction over a claim" if, among other reasons, "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1). That is the situation with Plaintiff's second count.

In their Complaint, Plaintiffs assert: "Under *Ex Parte Young*, 209 U.S. 123 (1908), actions against state officials seeking prospective injunctive relief are not barred by sovereign immunity." ECF 1 (Complaint), ¶ 15. Thus, state sovereign immunity would not bar the relief Plaintiffs seek under Plaintiffs' first and third counts. Plaintiffs' second count, however, involving a pure question of state law, may be different.

The Supreme Court has held that the *Young* exception does not apply in a suit against state officials on the basis of state law. The Supreme Court explained:

> A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). Although Defendants have not asserted the Eleventh Amendment as a defense to Plaintiffs' second count, the Ninth Circuit has held that the effect of the Eleventh Amendment must be considered *sua sponte* by federal courts. *See Demery v. Kupperman*, 735 F.2d 1139, 1149 n.8 (9th Cir. 1984).

Because the parties have not briefed either the question raised by 28 U.S.C. § 1367(c)(1) or the question presented in *Pennhurst*, the Court will not resolve either issue at this time but will

afford the parties an opportunity to be heard if they wish. Thus, in the exercise of judicial efficiency, the Court will defer ruling on the merits of Plaintiffs' motion for summary judgment regarding Plaintiff's second claim.

**CONCLUSION**

The Court GRANTS Defendants' Motion to Dismiss (ECF 33) and dismisses Plaintiff's claims that are based on federal law. The Court DENIES IN PART Plaintiffs' Motion for Summary Judgment (ECF 47) and denies the portion of Plaintiffs' motion that addresses Plaintiffs' claims based on federal law. The Court DEFERS ruling on Plaintiffs' Motion for Summary Judgment (ECF 47) regarding Plaintiff's second count, which only presents issues of state law.

**IT IS SO ORDERED**.

DATED this 22nd day of June, 2022.

*/s/ Michael H. Simon*
Michael H. Simon
United States District Judge